JOHN C. LUCAS, Guardian, &c., *v.* HOLLY GOFF.

1. WILL: NUNCUPATIVE: MUST BE CLEARLY ESTABLISHED.—Nuncupative wills, made *in extremis,* are sanctioned by the law of this State, and when duly proven, are entitled to be established; but owing to the facility with which frauds may be committed in setting up nuncupative wills, the law requires every one of the provisions of the statute on this subject to be strictly complied with; and hence the testamentary capacity and the *animus testandi,* at

the time of the alleged nuncupation, must appear by the clearest and most indisputable evidence.

2. Same.—The deceased, being informed by his attending physician of his precarious condition, was asked if he had made any disposition of his property; to which he replied, that it was too late, and that he was unable to make a written will, but that he desired E. H. to have all his property; and that he wanted some good person to take charge of it for her, so that she might be benefited by it, but that he was afraid that it would not be done, and that his property would fall into the hands of some person who would destroy it: Held, that these facts did not sufficiently establish the *animus testandi*, at the time the words were spoken, and did not therefore constitute a valid act of nuncupation.

3. Same: EVIDENCE: EFFECT OF NEGATIVE TESTIMONY.—The testimony of a witness (who was present, and near enough to hear all that was said by the deceased) to the effect, that he did not hear certain words evincing a desire to make a nuncupative will, the speaking of which was testified to by another witness, also present, and that he was sure no such words were spoken, being negative in its character, is not entitled to the same weight as the positive testimony of the other witnesses; yet its legitimate effect is to leave in doubt the existence of the *animus testandi*, clear and indisputable proof of which, is essential to the establishment of a nuncupative will.

In error to the Probate Court of Attala county.   Hon. E. M. Wells, judge.

The facts are very fully stated in the opinion of the court.

*J. A. P. Campbell,* for plaintiff in error.

Application was made to the Probate Court of Attala county, to probate what was alleged to be the nuncupative will of Garland Goff, which, being refused, a bill of exceptions was signed and sealed, embodying the evidence adduced in support of the application, and a writ of error prosecuted to this court.

The facts, as shown by the record, are, that Garland Goff and his wife were both taken suddenly and violently ill, and on the 10th of March, 1857, Dr. James Henry, their attending physician, informed Goff that his wife was hopelessly ill, and there was no prospect of her recovery; and told him that he himself was dangerously sick, and asked him "if he had made any disposition of his property?" to which Goff replied, "it was too late, and he was not able to make a written will, but that he desired that Elizabeth Hughes should have all of his property, and that he wanted some

good man to take charge of it for her, so that she might be bene-fited by it, but that he was afraid that it would not be done; that it would fall into the hands of some person that might destroy it." These words were spoken in the presence and hearing of Dr. Henry and Chappell Hughes, and Goff died that night, at his own home, in Attala county, where his sickness occurred. He was of sound and disposing mind and memory, at the time of speaking these words.

The foregoing is the testimony of Dr. Henry.

Chappell Hughes, who was also present, testifies "that he heard Dr. James Henry advise Mr. Goff that his wife was very sick and likely to die, and there was no hope for her; and he also told Goff that he was dangerously sick himself, and that he ought to make some disposition of his property, and that Henry said (to Goff): ' Here is this girl you have raised.'   Mr. Goff replied, ' I want all my property to go together; I allow her to have it all.' "   Witness understood Mr. Goff to mean Elizabeth Hughes. He says further, "the attention of Mr. Goff was directly called, by Dr. Henry, to a disposition of his property."

It was further proved that Goff had no children, and that Eliza-beth Hughes had been an inmate of his family for ten or twelve years, and was raised by Goff; and that Goff repeatedly, before his last sickness, declared his intention that she should have all of his property, as "she had been a faithful and dutiful child, and had assisted him in making what he had."

It is true that Dr. Henry and Chappell Hughes, the witnesses who were present, do not concur in their recollection and statement of all that was said, but they do agree as to the fact, that Goff was informed of the extreme and hopeless illness of his wife, and of his own dangerous condition and probable death, and that his attention was directly called, by Dr. Henry, to a disposition of his property, in view of death; and that Goff, in immediate reply to the suggestion, as to a disposition of his property, said, "that he wanted it all to go together; I allow her (Elizabeth Hughes) to have it all," as Chappell Hughes testifies; or, "he desired Eliza-beth Hughes to have all of his property, and that he wanted some good man to take charge of it," &c., as expressed by witness Henry.   And while it is true that Hughes does not remember all

that Henry testifies to, as having been said by Goff, yet it is true that Henry fully concurs, substantially, with all that Hughes testifies to, and we thus have the concurring testimony of two witnesses to the speaking of the testamentary words by Goff, and the circumstances under which they were spoken. And as the witnesses substantially agree in their testimony, as to the testamentary words of the testator, it is wholly immaterial whether they agree and support each other, as to other expressions, not testamentary in their character, or not. Such differences in the recollection of witnesses, and discrepancies in their testimony, constantly occur, and are readily accounted for; the more especially where witnesses are called on to relate the expressions of another, and that too amid sickness, anguish, and death, when the feelings are excited and the sympathies aroused.

It may be well supposed that Dr. Henry, who, from his profession, may be presumed to be accustomed to scenes in the habitations of the sick and dying, and who, on this occasion, felt it to be his duty to inform Mr. Goff of the appalling fact, that his wife would surely die, and that he too would probably die soon, would be the more likely to mark well and remember distinctly the words of his dying patient, than anybody else; and when it is remembered that Goff had frequently told Dr. Henry that he intended Elizabeth Hughes to have all his property at his death, and that Henry saw that this contingency was speedily approaching, and called Goff's attention directly to the subject of disposing of his property, in view of death, all doubt is at once removed as to which of the witnesses is most likely to have been correct in his recollection of what Goff said.

But be this as it may, one thing is certain, they agree in the main, and as to enough for the purpose of establishing the will of Garland Goff, made in his last sickness, in great extremity. As his wife was about to die, and he was to follow quickly, when admonished of his approaching end, and when his property was undisposed of, and his "faithful and dutiful child" (Elizabeth Hughes) unprovided for, are brought to his view, he remembers her fidelity and toil, and his oft-repeated resolution, and declares it as his dying wish that she (Elizabeth Hughes) shall have all his property; and, not content merely with this, he is concerned that it be taken care of for her.

That Garland Goff desired Elizabeth Hughes to have all his property, and that he declared this desire on his deathbed, in the presence of two competent witnesses, and that he desired a person present (Dr. Henry) "to be informed and understand" (*Parkison* v. *Parkison*, 12 S. & M. 672) that such were his wishes, cannot be doubted, in view of the foregoing facts.

It matters not whether he was aware of the legal effect of his declaration or not,—if made with a view of fixing the ownership of his property, after his death, it is sufficient. Even if he thought that he could not legally dispose of his property by nuncupation, yet if he desired to thus dispose of it, and declared his desires, wishing them to be remembered, and observed, it is sufficient to establish his words as a will.

The proof shows Goff to have been an illiterate man; and while the law presumes every man to know the law (a singularly false presumption), it is probably true, in point of fact, that Goff deemed himself entitled to dispose of his property by nuncupation; and while he had some knowledge of written wills, only considered this another way of doing what might as well be done by nuncupation. The remark of Goff, as testified to by Henry, that it was too late, and he was not able to make a written will, immediately followed by his declaration that he wanted Elizabeth Hughes to have it all, together with his concern about the future of the property, all go to show that Goff thought he was fixing the course of the property after his death, and show clearly that he was performing a testamentary act, *i. e.*, that he spoke the words proved *animo testandi*. The witnesses present so thought, and in a few days wrote down his words as a will.

A will is defined to be "the legal declaration of a man's intentions, which he desires to be performed after his death." Was there, in this case, a legal declaration of his wishes by Garland Goff?

I propose to answer this question by the authorities.

There have been five decisions in this State on nuncupative wills, viz., *Gibson* v. *Gibson*, Walker's Rep. 364; *Garner* v. *Lansford*, 12 S. & M. 558; *Parkison* v. *Parkison*, 12 S. & M. 672; *Woods* v. *Ridley*, 27 Miss. 119; and *Burch et al.* v. *Stovall*, 27 Miss. 725.

1. The case *Gibson* v. *Gibson*, merely decides, that to constitute

a nuncupative will, it must appear that the *animus testandi* existed. A truism no one ever thought of disputing.

2. The next case, *Garner* v. *Lansford,* involved a state of facts materially different from the case at bar, and cannot be considered as in point, except in so far as it establishes the rule, that a nuncupative will cannot be established, without proof in accordance with the statute. A principle not desired, nor needed to be controverted, in this case; for in the case at bar, the proof was in accordance with the statute, as I will show by authorities.

3. The case of *Parkison* v. *Parkison* (which appears to have been well considered), is much in point, and the opinion of the court, then delivered, is valuable as illustrating the policy and meaning of our Statute on Nuncupative Wills. The court say, " The main object of the statute, in requiring the *rogatio testium,* is to distinguish between a testamentary act by one *in extremis,* and loose declarations and casual conversations, as to the disposition of his property, and to prevent the latter from being passed off as testamentary." I ask, does not the evidence, in the case at bar, " distinguish between a testamentary act by one *in extremis,* and loose declarations and casual conversation ?" When Goff is told that his wife will certainly die; that he will most probably die; when the subject of disposing of his property, in view of approaching death, is presented to his mind, and he himself is impressed with the belief that he is too far gone, and is not able to make a written will, he expresses the wish he has entertained for years that Elizabeth Hughes shall have all his property, and manifests anxiety for its future preservation from waste for her benefit, and fears lest it may be squandered after he is gone; the persons present understand him to be endeavoring to fix the course of his property after his death; and remembering after his death his wishes, as expressed by himself but a few hours before it, they reduce to form his nuncupative will; and now it is said that Goff did not perform a testamentary act, that what he said were "mere idle words," "loose declarations and casual conversations;" accidental expressions, without design or meaning. Surely a recurrence to the evidence will dissipate such an idea. In the language of the Court of Appeals of Kentucky, in their opinion in the case of *Hare* v. *Bryant,* Printed Decisions, 317 (and in the spirit of our own decisions upon

our statute, which is in the precise language of the Kentucky statute): "Under the statute requiring, among other things, to render a nuncupative will valid, that the testator should have called on some one present to take notice, &c., if it was proved sufficiently what the meaning and intention of the testator was, it would be absurd that her (his) ignorance of this formality should defeat her (his) intention."

4. The case of *Woods* v. *Ridley*, in so far as it involves the question of a nuncupative will, is strongly in my favor. It involved a state of facts, arising under the Tennessee statute of nuncupative wills, which differs from ours in this material point, viz., that it requires proof of a special *rogatio testium*, in order to make a valid nuncupative will.

The learned counsel for the appellee in that case, in his argument, impliedly admits that the expression by Woods, "I wish Betsey to have this place," amounted to a valid nuncupative will; and to the same effect is the language of the court in its opinion. If that was a valid nuncupative will under the Tennessee statute (less liberal in such cases than ours), *a fortiori*, would it be so considered under our statute? In this connection, I ask the attention of the court to the following decisions of the courts of Tennessee: 4 Humph. 342; 8 Id. 639.

5. The case of *Burch et al.* v. *Stovall*, is directly in point, in the case at bar, and clearly establishes the will of Garland Goff, as I conceive. There is a striking similarity between the two. The great extremity of the testator; the consciousness of rapidly approaching death, and that he was too far gone to make a written will; the uttering the testamentary words, in direct and instant reply to the suggestion of his physician, as to the subject of disposing of his property in view of death, together with the often repeated declaration by Goff, that he wanted Elizabeth Hughes to have all his property, establish a strong resemblance between the case at bar, and that of *Burch* v. *Stovall*. The court, in delivering its opinion in that case, say, "It is true that no person was called on, in so many words, to take notice, &c.; but words of like import were certainly employed, or if not words of the same meaning, the circumstances under which they were spoken, and surrounding the transaction, impress upon it the same legal effect." I ask, in con-

fidence of an affirmative answer as to the case at bar, do not the circumstances under which Goff spoke the words in question, and which surround the transaction, impress upon it the same legal effect? Was not the statute, Hutch. Code, 650, substantially complied with, and its object fully met?

After this review of our own decisions, I invite attention to the decisions in other States, and to a consideration of general principles.

The English statute on the subject of nuncupative wills, as well as those of New York, Pennsylvania, Tennessee, and probably most of the other States, is materially different from ours in some respects, from which there arises a necessity for circumspection in considering their adjudications as authoritative, in cases arising under our statute, and we should rather look to and adopt, the decisions of the courts of those States, whose statutes are the same as ours.

Kentucky and Virginia each have a statute of which ours is a transcript, and looking to their decisions, it seems clear, that the alleged nuncupative will of Goff should be established as such.

The Kentucky Court of Appeals, in the case of *Hare* v. *Bryant*, Printed Decisions, 317, say, "Under the statute of 1797, requiring, to render a nuncupative will valid, that the testator should have called on some one present, to take notice, or bear testimony, that such is his will, or words of the like import, if it was proved sufficiently what the meaning and intention of the testator was, it would be absurd that her ignorance of this formality should defeat her intention." The same court afterwards, in deciding the case of *Portwood et al.* v. *Hunter*, 6 B. Monroe, 538, in remarking upon the same statute, say, "The object of the statute was to require only, that the purpose and intention of the testator, and terms of the will, should be clearly established by two witnesses at least; and if the attention of the witnesses was so called to the subject, by any form of words, as to enable them to prove such purpose and intention, as well as the terms of the will, clearly and unequivocally, the requisitions of the statute, embraced in the terms 'or words of like import,' are substantially complied with."

They also cite and confirm *Hare* v. *Bryant*, Printed Decisions, 317, and hold a substantial compliance with the statute sufficient. See also 9 B. Monroe, 553; 3 Id. 163.

To the same effect are the decisions in Virginia. 1 Munf. 456; 3 Leigh, 340; 1 Grattan, 129.

According to these decisions, the proof in the case at bar was sufficient to establish the will. The purpose and intention of the testator (Goff), and terms of his will, are clearly established by two witnesses, and the attention of the witnesses was so called to the subject (by the suggestion of Dr. Henry, and Goff's reply), as to enable them to prove his purpose and will, in relation to his property, as well as the terms of his will (desiring Elizabeth Hughes to have it all), clearly and unequivocally. "The requisitions of the (our) statute, embraced in the terms 'or words of like import,' are substantially complied with."

"Two witnesses concur, that a person was, in a legal sense, called on to take notice, or bear testimony, that certain words constituted the will of the deceased." (Language of Judge Fisher in *Burch et al.* v. *Stovall*, 27 Miss. 725.)

It is not necessary to prove, that two persons were called on, nor is it necessary to prove that one was formally and specially called on; but under the terms of our statute, "or words of like import," "the circumstances under which they (the words) were spoken, and surrounding the transaction," may be inquired into, and if found to "impress upon it the same legal effect," as if this formality had been complied with, it is sufficient. *Burch et al.* v. *Stovall*, 27 Miss. 725.

In that case it appeared, that Mrs. Hinkle had desired and intended to make a written will, and it is not shown by the proof, that she was even aware that she could make a valid will by nuncupation, or that she formally expressed any desire so to do, but simply declared her wishes, as to her property, to a friend whom she wished to "talk with." In that case, Mrs. Gilmore (one of the witnesses present) remembered and proved more, as to the words of the deceased, than did Mrs. Morgan, the other witness (just as in the case at bar Dr. Henry remembers and states more than Chappell Hughes); but as both "concur as to words uttered as testamentary, by the deceased, and as to the circumstances under which they were uttered," the will was established. So it should be in this case, which, in many features, is strikingly analogous to that, and in others, much more favorable to the establishment of the will.

A nuncupative will may be made, not only on the proper motion of the testator, but on the interrogation or suggestion of another. 1 Eng. Ecclesiastical Rep. 32; 12 Gill. & Johns. 192; Chilton's Pro. C. L. 56; Swinburne on Wills, 39–113.

In the case at bar, it was made upon the interrogation of the attending physician, and his suggestion of immediate action, if any was intended. And Goff did not specially request Dr. Henry to take notice, that what he was about to say was his will, because there was no necessity for, nor propriety in it, as the utterance of the alleged testamentary words, was a direct and immediate reply to Dr. Henry's suggestion, to which Dr. Henry was *mero motu* paying special attention. When Goff promptly and directly replied to the inquiry of Dr. Henry, "it was equivalent to saying, I wish you to take notice, or bear testimony, that I uttered these words, or made this disposition of my property;" or "I wish you to understand, or be informed, that I want Elizabeth Hughes to have all my property," which, in the language of the case, is sufficient.

The right to make a will by nuncupation existed at common law. The unqualified allowance of nuncupative wills, was a fruitful source of fraud; and hence the statute regulating their proof. Its object was "to distinguish between a valid nuncupative will, and casual conversation, by one in his illness, on the subject of his property, and to guard against the latter being imposed on the court, as testamentary." 4 Humph. 342; 12 S. & M. 672.

Wherever the object of the statute is fully satisfied, and its policy complied with, it is sufficient, without a literal compliance. A substantial compliance is all that is required. 4 Humph. 32; 12 S. & M. 672; 27 Miss. 725; 6 B. Mun. 538; 9 B. Mun. 553.

The object of the Statute of Nuncupative Wills, is not so much to abridge the right of testamentary nuncupation, as to prescribe the proof, upon which it shall be shown that the right was exercised. And where the required number of witnesses concur in their testimony of the exercise of this right of testamentary nuncupation, under such circumstances as not to fall within the evil intended to be prevented by the statute, the will should be established.

In conclusion, I remark that,

1. The words of Garland Goff were uttered *animo testandi,* in his last sickness, his very extremity.

2. They were uttered at the habitation of deceased, where his sickness occurred.

3. Two witnesses prove, that "a person present, was, in a legal sense, called on to take notice, bear testimony, or be informed of his testamentary words," by Goff. The statute was substantially complied with, and the judgment of the Probate Court was wrong, and should be reversed.

*Jason Niles,* for defendant in error.

The counsel for defendant in error respectfully submits the following points to the consideration of the High Court of Errors and Appeals:

1. As regards nuncupative wills, "if the proof fail in establishing a strict compliance with any one of the provisions of the statute, it will be fatal to a case of this description; for example, the *rogatio testium,* which is, in truth, the evidence of the *animus testandi,* must be clearly and strictly proved, or it will not be a valid nuncupative will." Mr. Chief Justice Smith, in *Woods* v. *Ridley,* 27 Miss. Reports, 146.

It will not be contended that the testator called on any person present, to take notice, or bear testimony, that such was his will; nor that he used any words of like import. Hutch. Code, 650. An attempt may be made to show that this requirement of the statute need not be complied with, in order to establish a nuncupative will; in other words, that courts may wholly disregard this portion of the statute, and infer the existence of the *animus testandi,* even in the entire and utter absence of that which the statute has prescribed, as the indispensable evidence of such *animus.* For courts to do this, would be to nullify and render nugatory the most clearly expressed requisitions of our statute law.

2. This requirement of the *rogatio testium,* may be assimilated to that contained in the Statute of Frauds, in which it is provided, that in order to uphold an action brought upon a contract for the sale of lands, there must be some memorandum or note thereof in writing, and signed by the party to be charged therewith. Now, it is the settled doctrine, that as our Statute of Frauds contains no exceptions in regard to such contracts, the courts will not create any. See *Beaman* v. *Buck,* 9 S. & M. 210; *Box* v. *Stanford,* 13

S. & M. 95.    It may also be assimilated to the provision, in regard
to the bar of the Statute of Limitations.    See *Smith* v. *Westmore-
land*, 12 S. & M. 665, where the court say, that "a much more
loose construction of statutes was formerly indulged than seems
now to be thought allowable.    It is not the province of courts to
engraft exceptions upon statutes, or to impair their practical utility
by the introduction of refinements.    We have thought it our duty
to follow the terms of our statutes, and to adhere closely to their
provisions."

3. The witnesses (Henry and Goff) are both introduced to es-
tablish the will.    Those facts deposed to, and with regard to which
both witnesses concur in their testimony, may be considered as
proved; but the statements of each, when contradicted by the
other, are to be altogether disregarded.    Hughes denies positively
that either Goff or Henry said anything about making a will, and
swears that the word "*will*" was not used.    He swears too that
nothing was said about Goff's wanting some good person to take
charge of, and keep his property for Elizabeth Hughes, or for any
other person.    Henry's testimony, as regards these matters, cannot
be received as true, inasmuch as he is directly and positively con-
tradicted by Hughes.    It is undoubtedly true, however, that in
reply to some interrogatory made by Henry to Goff, about the dis-
position of his property, Goff said, "I allow for her (Elizabeth
Hughes) to have it all."    Henry says this remark of Goff's was
made in reply to his question as to what disposition he had made
of his property, Goff saying, at the same time, that it was "too late
to make a written will."    Hughes says it was in response to a re-
mark make by Henry to Goff, that he (Goff) ought to make some
disposition of his property.    There is some discrepancy between
the witnesses as to what Goff actually said—his precise words.    It
is worthy of remark, that Henry does not pretend to give his exact
language, but only the substance in the witness's own phraseology.
He uses the third person throughout, in detailing what Goff said.
"He (Goff) desired," "he wanted," "he was afraid," &c. &c.;
while Hughes swears as to his confidence in giving Goff's almost
identical language, employing the first person throughout.

(See Hughes's testimony on cross-examination.)

4. Do the words, "I allow her (Elizabeth Hughes) to have it

all" (all my property), uttered by Goff, either in reply to Henry's question (as H. testifies) as to what disposition Goff had made of his property, or in reply to Henry's remark (as stated by Hughes), that Goff ought to make some disposition of his property,—do those words amount to a will? Where is the evidence of the *animus testandi?* There is no *rogatio testium;* no uttering of "words of like import." Henry says nothing of Goff's calling upon some person to take notice that the disposition then made was his will. Hughes says the word will, was not named by either Henry or Goff, nor was anything said by either as to making a will. If Henry's statement were taken to be true, as to Goff's saying he was not able to make a written will, it would, perhaps, conduce quite as much to disprove any *animus testandi,* as to prove its existence. But this statement, imputed to Goff, is denied explicitly by Hughes. In *Garner* v. *Lansford,* 12 S. & M. 558, it was proved by two witnesses that the deceased said, "I want my wife to have what little property I have," and "made and declared" that, to be his last will and testament; yet the court say it was no will. Now, this cannot be considered as strong a case in favor of the will, as the one just cited. The words uttered in that case were certainly as strong and unequivocal, as those uttered by Goff, indeed more so; and, besides, it was there proved that the deceased had declared that, to be his last will and testament, while here there was no declaration of the sort. If the words spoken in *Garner* v. *Lansford,* therefore, did not amount to a will, then, *a fortiori,* the words spoken by Goff cannot be entitled to that dignity.

In *Parkison* v. *Parkison* (12 S. & M. 673), the testator stated, that "he wished to make a will," and when he was told, to "state his wishes" to two gentlemen present, the testator immediately did so; some person, after absenting himself for a few minutes, returned to the sick man's room, and informed him that his will would not probably be legal, unless he gave certain other brothers and sisters something. He accordingly gave them five dollars, calling their names. The witness testifies, that "his words, in expressing his will, were clear and distinct."

In the case at bar, it is not shown that Goff wished to make a will, as in the one just cited. In that case, the testator so declared; in this, it cannot be fairly inferred that the deceased wished then

to make his will; much less that he supposed himself to be making it, when he said what he did.

In *Burch* v. *Stovall* (27 Miss. Rep. 725), it was proved by two witnesses, " that a person was, in a legal sense, called on to take notice, or bear testimony, that certain words constituted the will of the deceased." In that case, the court say, " Not a doubt can exist as to the intention of the deceased to make the above testamentary disposition of her estate." In this case, such intention cannot be inferred, without an unfair stretch of language and of logic; and there can be no pretence of any compliance with the statute, in regard to the requirement of the *rogatio testium*. If the words spoken by Goff should be declared his will, then that requisition of the statute is virtually abolished.

As I do not conceive it possible, that the will in this case can be established as such, I have not thought it necessary to discuss the question as to the validity of a nuncupative devise of realty, which may arise, and which is an open question, I believe, in Mississippi.

SMITH, C. J., delivered the opinion of the court.

This controversy had its inception in an application to the Court of Probates of Attala county, to admit to probate a nuncupative will, alleged to have been made by Garland Goff, deceased. The application was refused, whereupon a writ of error was sued out to this court.

The following instrument, purporting to contain the will of the deceased, was introduced on the trial, to wit: " Know all men by these presents, that we, James Henry and Chappel Hughes, of the county and State aforesaid, on the tenth day of this month, to wit, the month of March, 1857, were at the dwelling of Garland Goff, in said county, who was then confined from a sudden illness; and the said Garland Goff, being in expectation of speedy dissolution, and in fact being in extremity, about one o'clock of the said 10th day of March, in the year aforesaid, his attention was called by the said James Henry to the disposition of his property after his death. He then in answer thereto, declared his will as to the disposition he wished to be made of the same after his death; and did then and there utter the testamentary words following, or words to the like effect, namely, ' I allow for Elizabeth Hughes to have all of my property'

(meaning by these words, that he willed all of his property, to the said Elizabeth Hughes, to have and enjoy the same fully after his death) : at the utterance of these words the said Garland Goff was of sound and disposing mind and memory, and so continued to be until he died, which took place about half-past twelve o'clock of the same night. And afterwards, to wit, on Saturday, the 14th day of the same month, and year aforesaid, in the said dwelling, we together caused to be reduced, under our immediate direction, the same testamentary words, to writing, and to form this memorial, which is a full, complete, and exact narration of the same."

This instrument was attested by the signature and seal of the parties who drew it up. In their subsequent examination as witnesses, they do not entirely agree with each other, nor with their written statement of the testamentary words alleged to have been spoken by the deceased. These diversities and the conflict in their testimony are important, and must have had weight with the court, as their tendency was to leave at least in doubt, facts, the clear proof of which was essential to the establishment of a nuncupative will.

Dr. Henry testifies, that he was at the house of the deceased on the 10th of March, 1857, and that he asked him if he had made any disposition of his property. Deceased replied, in the presence of Chappel Hughes, " and said, that it was too late, and that he was not able to make a written will, but that he desired that Elizabeth Hughes should have all of his property, and that he wanted some good man to take charge of it for her, so that she might be benefited by it," &c. And that deceased " spoke these words in the presence and hearing of said Hughes, loud (enough) to be heard, and was heard by said Hughes; and were an immediate reply to the questions about the disposition of his property."

Chappel Hughes, the other witness of the transaction, stated, that he was present at the house of the deceased, on the 10th of March, 1857, during his last illness; and that he heard Dr. Henry inform deceased of his wife's dying condition, and that "he also told Goff that he was dangerously sick himself, and that he ought to make some disposition of his property, and that he (Henry) said, here is this girl you have raised. Mr. Goff replied, I want all my property to go together; I allow her to have it all. This is the

sum and substance of the language used by Mr. Goff. Perhaps Dr. Henry, in speaking to Mr. Goff, said Elizabeth Hughes."

On cross-examination this witness testified, that he was certain that deceased " did not call any name at the time of said conversation." That he objected to signing the instrument presented as the nuncupative will of the deceased, when it was presented and signed by him, because the name of Elizabeth Hughes was used; but that he did sign it, because he believed that the word her, spoken by the deceased, referred to, and meant Elizabeth Hughes; and that "neither Dr. Henry nor Mr. Goff said anything about making a will; that the word 'will' was not used; that he has no recollection of Mr. Goff's saying, it was too late to make a written will; if he said so, he did not hear him, and that he is certain that Goff did not use such words; that nothing was said about his (Goff's) wanting some good person to take charge of, and keep his property for Elizabeth Hughes, or for any other person." That the language testified to by witness, as having been spoken by the deceased, "is in nearly the exact language of the deceased, as he can recollect." "He thinks they are in about the precise words." This witness was in a position which enabled him to hear distinctly whatever was said by Dr. Henry or the deceased, when the alleged testamentary words were spoken.

Facts testified to by the witnesses, and in regard to which there is no dispute, show that it was very proper that the deceased should have made some provision for Miss Hughes. She had been reared in his family, and had faithfully assisted him in his business, and had aided in the accumulation of his property. He had no children, and his wife was then in a dying condition; he had previously declared his intention to provide for Miss Hughes, and there is no doubt that such was really his purpose. With every disposition therefore to uphold the will, if it could be done with propriety, we are nevertheless bound to determine the question of its validity, by the established principles applicable in such cases.

The validity of verbal wills, made *in extremis*, in contemplation of death, is sanctioned by the law of this State, and when duly proved are equally, with written wills, entitled to be established. But the statute has imposed numerous restrictions upon wills of that character, which the manifest policy of the law requires to be

strictly complied with. As held uniformly by this court, a failure to establish by strict proof, a compliance with any one of these restrictions, will be fatal to a case of this species. The great temptation which frequently exists, and the facility with which frauds may be committed, in setting up nuncupative wills, require it is said, a greater strictness and stringency, in every single particular, in the proof of such a will, than in that of a written one. Hence it is laid down, that "the testamentary capacity and the *animus testandi*, at the time of the alleged nuncupation, must appear, in the case of a nuncupative will, by the clearest and most indisputable evidence."

Let us apply this rule, to the evidence in the record. Assuming that there is no conflict in the testimony, but that both of the witnesses present at the alleged act of nuncupation, concurred in the statement of the facts, as detailed by the first one examined, Dr. Henry; the established facts are as follows: The deceased, being informed of his precarious condition, was asked whether he had made any disposition of his property. To which he replied, "it was too late, and that he was not able to make a written will, but that he desired that Elizabeth Hughes should have all of his property; and that he wanted some good man to take charge of it for her, so that she might be benefited by it; but that he was afraid that it would not be done, that it would fall into the hands of some person who might destroy it."

These facts are insufficient to show, clearly and indisputably, that the deceased uttered the words attributed to him, with a testamentary purpose. In reply to the question whether he had made any disposition of his property, he said, "It is too late, and I am not able to make a written will." This language might indicate his consciousness of impending death, but it certainly does not tend in the slightest degree to prove, that he then meditated or intended to make a testamentary disposition of his estate. The opposite would be the more reasonable conclusion. For whatever his previous intentions may have been, they seem then to have been abandoned. It was then too late, and he was not able to make a written will. He was not informed, and may not have known, that a verbal will, made under the circumstances, would have been valid. From what circumstance then are we to infer, that the words expressing

his desire that Miss Hughes should have all of his property, immediately following his declaration that it was too late, and that he was unable to write a will, were spoken *animo testandi?* The only answer that can be given is, that there is no ground for such an inference.

We have looked at the testimony, in its most favorable aspect, for the plaintiff in error. But when we come to consider the testimony of the other witness, it is impossible not to doubt as to some of the facts, relied on to prove the *animus testandi.*

The witness Hughes, swears that no mention was made of a will by either the decedent or Dr. Henry, and that the deceased said nothing about its being too late, or that he was unable to make a written will, or that he desired some good man to take charge of the property for the benefit of Miss Hughes.

The testimony of Hughes, it is true, is negative; and is therefore not entitled to the same weight with that of Dr. Henry. But nevertheless its legitimate effect, is to detract from its certainty. And hence, if it were conceded that the facts deposed to by Dr. Henry, if true, are sufficient to prove that the words were spoken by the deceased, under the belief and with the intent of making his will, we are not authorized, from the whole evidence in the cause, to hold that the material and essential fact, the *animus testandi,* is clearly and sufficiently proved.

Judgment affirmed.