SCHMITZ *et al. v.* SUMMERS *et al.*

(Division A.    May 31, 1937.    Suggestion of Error Overruled July 19, 1937.)

[174 So. 569.    No. 32779.]

**Stone & Stone**, of Coffeeville, and **W. J. Evans**, of Calhoun City, for appellants.

262

R. F. Kimmons, of Water Valley, for appellee.

264

Argued orally by **W. I. Stone**, for appellant, and by **R. F. Kimmons**, for appellee.

**Cook, J.**, delivered the opinion of the court.

In this cause there is presented a contest of an alleged nuncupative will of W. T. Summers, deceased, which was proved by the testimony of four witnesses who claimed to have visited the testator on Saturday morning before his death on the following Monday night, July 6, 1936.

The said W. T. Summers resided about ten miles from the home of his niece, Mrs. Lorena Schmitz, one of the proponents of the alleged will, and on Wednesday, July 1, 1936, while he was visiting in the home of this niece, he he had a chill and continued to be ill thereafter until his death on the following Monday night. One of the witnesses to the alleged will, who lived near the home of Mrs. Lorena Schmitz, testified that he saw Mr. Summers every day from Wednesday, July 1st, until Saturday, July 4th, and that during that time he was in bed part of the time

and up and about the house part of the time; that he had a second chill on Friday, July 3d, and that on the morning of July 4th he went to the home of Mrs. Schmitz about 7 o'clock a. m. and found Mr. Summers lying on the bed, dressed in his usual daily attire, except his shoes. He further testified that Mr. Summers told him that he had gone to the dining room that morning and eaten his breakfast, and that he was feeling all right except that he was very weak; that he stayed there until after 12 o'clock; that during all that time Mr. Summers, who was a very talkative man, led the conversation and discussed matters of general community interest, his business affairs, and particularly the number of individuals in the community who had beat him out of money. He testified that he also discussed the unusual number of deaths in the community about that time, and the fact that he had come to the home of his niece for the purpose of securing the services of a justice of the peace in the matter of taking renewals of mortgages from his debtors who resided in that immediate community. He further testified that there was no change in Mr. Summers' physical condition up to the time he left him after 12 o'clock, but that late in the afternoon he was seized with another chill, which was more severe than those which he had had previously, and that thereafter he was critically ill and incapacitated physically and mentally.

During the period that the witness J. C. Landreth, mentioned above, was with Mr. Summers on July 4, 1936, and between about 8 and 9:30 o'clock a. m., three other men visited him, and these three also testified that the alleged testator told them that he was feeling very good, except that he was very weak, and the four testified that during their conversation with him he said: "Boys, I want you boys here present to listen to and witness a statement I am going to make concerning my property in case I die; I am sick and I may die and I may get well, but if I die I want all my property to go to Marvin and Lorena.

They are the only ones of my people who care anything for me. They have cared for me in sickness for years, and I want them to have my property if I die. I do not want any other of my people to have any part of my property.''

A physician who was a long-time friend of Mr. Summers was called to see him on Friday afternoon, July 3d, and he testified that he diagnosed Mr. Summers' illness as being the result of malaria; that he learned from the history of the case that he had had chills; and that while he was then a sick man he was in good spirits, and there was then nothing in his condition to indicate that he was dangerously sick or in danger of an immediate or early death, and nothing to indicate that Mr. Summers thought he was seriously or dangerously sick, or that he apprehended death at any early date.

Section 3556, Code of 1930, provides as follows: ''A nuncupative will shall not be established unless it be made in the time of the last sickness of the deceased, at his or her habitation, or where he or she hath resided for ten days next preceding the time of his or her death, except when such person is taken sick from home and die before his or her return to such habitation, nor where the value bequeathed exceeds one hundred dollars, unless it be proved by two witnesses that the testator or testatrix called on some person present to take notice or bear testimony that such is his or her will, or words to that effect.''

It will be noted that this section merely fixes the place where, and the circumstances under which, a nuncupative will may be made, and the number of witnesses and the character of testimony required to establish such a will, when the value bequeathed exceeds $100. The term ''last sickness,'' as used in this statute, is not defined, but it has been clearly indicated in several cases in this court that to constitute such ''last sickness'' the party must be in extremis, at least in the sense that he must not

have reasonable time and opportunity to make a written will. Lee v. Barrow, 156 Miss. 711, 126 So. 648; Lucas v. Goff, 33 Miss. 629; Parkison v. Parkison, 12 Smedes & M. 672. In Sadler v. Sadler, 60 Miss. 251, there was presented by demurrer the question of whether or not the testamentary words must be spoken when the party speaking them is in extremis, or at least at a period so shortly before death that there was afforded thereafter no convenient time or opportunity to have reduced them to writing; or, whether it is sufficient if the words are spoken in the last illness, and under a sense of approaching death, but the court declined to decide that question on demurrer, and disposed of the case upon another ground.

From an examination of the authorities the statement of the case note writer in 13 L. R. A. (N. S.) 1092, that there are three distinct lines of authorities as to the meaning of the words "last sickness" in statutes permitting nuncupative wills, appears to be correct. The weight of authority upon this question seems to be that, in order to satisfy this condition a testator must, at the time of making his declaration, be in extremis, and in such condition that he has not time or opportunity to reduce his wishes to written form. Other courts have held that it was sufficient if, at the time of making his declaration, the testator supposed that his then sickness would prove fatal. Other courts, including those of the states of Alabama, Kansas, Nebraska, Tennessee, and Washington, have adopted the view that it is sufficient if the sickness has progressed to a point where the testator expects death at any time, and is liable to die at any time, and in fact does die from such sickness.

All the authorities appear to require that there must be in the mind of the testator some contemplation of the near approach of death, and consequently it will be unnecessary to here lay down the rule in this state, for under any one of the three views above stated, the alleged

will here in question cannot be sustained. All wills are executed in view of the uncertainty of life and in contemplation of death at some future time, and there is always the possibility that illness may progress to the point where it will cause death, and we think it clearly appears from the evidence in this record that when the alleged testator executed the will in question there was in his mind no contemplation of the near approach of death. It is true that he was sick at the time, but we think the evidence clearly shows that neither he nor his physician considered his condition so serious or dangerous as to indicate any danger of death at any time in the near future, and this evidence does not show that the testator was impressed with even the reasonable probability of the near approach of death. The decree of the court below will therefore be affirmed. Affirmed.